# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

TAMELA K. BOWERS,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C06-3089-MWB

**REPORT AND RECOMMENDATION**

---

## I. INTRODUCTION

The plaintiff Pamela S. Bowers seeks judicial review of a decision by an administrative law judge ("ALJ") denying her applications for Title II disability insurance ("DI") benefits, and Title XVI supplemental security income ("SSI") benefits. Bowers claims the ALJ erred in finding her subjective complaints not to be credible, relying in vocational testimony that was based on an inaccurate hypothetical question, and rendering a decision not supported by substantial evidence in the record. (*See* Doc. Nos. 8 & 12)

## II. PROCEDURAL AND FACTUAL BACKGROUND
### A. Procedural Background

On October 1, 2003, Bowers filed applications for DI and SSI benefits, alleging a disability onset date of September 1, 2002. (R. 67-74; 382-84). In her application, Bowers claimed she was disabled due to manic depression and anxiety. She claimed these conditions cause her difficulty in getting up to go to work, talking to people, leaving the house, and staying at work, and she "always think[s] people are talking bad about [her]." (R. 94) At the reconsideration stage, Bowers added a claim that she is disabled due to chronic back pain. (*See* R. 24, and Bowers's hearing testimony) Bowers's applications were denied initially and on reconsideration. Bowers requested a hearing, and a hearing

was held on August 22, 2005, before Administrative Law Judge ("ALJ") George Gaffaney. (R. 406-48) Bowers was represented at the hearing by attorney Ronald J. Wagenaar. Bowers testified at the hearing, as did Vocational Expert ("VE") George Brian Paprocki. In addition, Charlene Piper, a neighbor of Bowers's, testified at the hearing. On January 12, 2006, the ALJ ruled that Bowers retains the residual functional capacity to perform work that exists in significant numbers in the national economy. He therefore denied Bowers's applications for benefits. (R. 20-29) Bowers appealed the ALJ's ruling and on October 31, 2006, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. 6-9)

Bowers filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Bowers filed a brief supporting her claim on March 26, 2007. (Doc. No. 8) The Commissioner filed a responsive brief on June 26, 2007. (Doc. No. 11) Bowers filed a reply brief on July 5, 2007. (Doc. No. 12) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Bowers's claim for benefits.

## B. Factual Background

### 1. Introductory facts and hearing testimony

At the time of the hearing, Bowers weighed 190 pounds and was 5'3" tall. She was born in1977, and was twenty-eight years old at the time of the hearing. She is right-handed. (R. 432) Her past work includes sandwich maker, waitress, and cashier. She worked about thirty hours per week as a sandwich maker at Pro Sandwich Shop, earning less than $6.00 per hour. The waitress job also was part time. The cashier job was at

Target, where she worked for approximately twenty months from 1996 to 1998. She also did some clerical work at Target, and worked in a fitting room. The ALJ noted that according to Bowers's earnings history, she had not performed work at the substantial gainful activity level at any of her previous jobs, and as a result, she has no past relevant work. (R. 410-13)

Bowers lives with her three children, who were ages 11, 8 and 5, at the time of the hearing. She testified she is unable to work due to depression, and she has difficulty leaving her house, caring for her children, and caring for herself. Her mother and her children do most of the housework. She does little housework and very little meal preparation. She stated her "anxiety level is sky high," and she has panic attacks. Her only income is from child support payments of about $450 to $550 per month. She also receives food stamps, HUD rent assistance, and some type of medical assistance. (R. 414-15)

Bowers completed the eleventh grade in school, and obtained a G.E.D. in 1995. She attempted some college courses but she was absent frequently due to depression, and she failed her courses. She stated she "ended up feeling like a failure and leaving." (R. 416) Bowers stated she was in "behavior disorder classes, special education" from about the third or fourth grade onward. According to Bowers, she was placed in the special education classes because her depression caused her to get upset very easily, become frustrated with herself and others, and miss a lot of classes. She would leave school without telling anyone. (R. 417)

Bowers has no difficulty with reading, spelling, or math, but she has problems remembering things. She forgets appointments even when she writes them down. She is distracted easily, has difficulty staying on task, and often leaves tasks incomplete. (R. 417-18)

Bowers indicated she also has a thyroid problem that causes her to feel "very shaky and very tired." (R. 418) She takes medication for her thyroid condition. The medication helps with the fatigue if she takes it every day as prescribed, but she often forgets to take it. (R. 418) The medication does not help with her shakiness. (*Id.*)

Bowers stated she also has constant pain in her lower back. She has problems sitting or standing for any length of time, going up and down stairs, and carrying things. Her lower back pain is "a constant, achy pressure pain," that sometimes radiates into her legs, especially on the left. She is treated at a pain clinic for her back pain, and she takes OxyContin and Oxycodone daily for pain. She stated the medications reduce her pain by about a third, so she still feels pain despite the medications. (R. 419-20, 423) Her back pain is aggravated by sitting or standing for a long period of time, lifting, and going up and down stairs. She can stand for about twenty minutes before she becomes uncomfortable due to pain. She can sit for "an hour or two," and a recliner is more comfortable for her than other types of chairs. She indicated straight-backed chairs, like the ones available during the ALJ hearing, are uncomfortable for her, and she changed positions frequently during the ALJ hearing. (R. 420-21) She has to change positions every couple of minutes when seated. (R. 421)

Bowers stated she can bend over but she has difficulty getting back up, and she would need assistance to get back up if she bent over more than a couple of times. She usually uses a chair or table to assist her in getting back up. She estimated she can lift about twenty pounds, noting she can lift a vacuum cleaner, a basket of clothes, or a gallon or milk using one hand. She tries not to do pushing or pulling activities because they cause pain in her back. She has no problems with gripping or fine manipulation. (R. 421-23)

Bowers stated her primary problems are related to her mental impairments. She has suffered from depression since she was six years old, and she has been on medication since she was about eight years old. Her depression causes her to be tearful and frustrated, and

she cries a lot. Depression interferes with her normal activities, such as taking her children to the park. She avoids going places where she might run into people, stating she becomes anxious and has panic attacks when she has to leave her house. She makes her excursions out of the house as brief as possible. She gets frustrated quite easily. (R. 423-24)

Bowers attempted suicide in the past, and although she has not attempted suicide recently, she "think[s] about it every day." (R. 424) Bowers takes Depakote (used, *inter alia*, to treat bipolar disorder), Abilify (a tranquilizer), and Cymbalta (an antidepressant), but the medications have given her only minimal relief other than making her somewhat less irritable. (*Id.*; *but see* R. 434, where Bowers opines she "would probably be a lot worse if [she] wasn't on the medication.") She sees a doctor about every three months for a medication check. She had just begun seeing a therapist the week before the ALJ hearing, and she planned to see the therapist every two to three weeks. (R. 424-25) She had last seen a therapist about two years earlier, but she had continued taking medications even when she was not seeing a therapist. (R. 432-33)

Bowers described her anxiety attacks, stating she will "feel like [her] throat is closing up," she gets short of breath, her heart races, she will be sweaty and shaky, and she "feel[s] like the world is closing in on [her]." (R. 425) She has an anxiety attack every day or two, and the attacks usually last five or ten minutes each. She sometimes has more than one attack in a day. To deal with the attacks, she will call her mother or a friend, walk around, or go outside and sit on the steps. Bowers stated leaving her house often triggers an anxiety attack. (*Id.*) She had an anxiety attack the morning of the ALJ hearing, when she felt "like the world was closing in on [her]" and her "heart was racing." (R. 431) She stated any type of stress will make her anxiety worse, giving examples of her children fighting or her mother asking her to clean her house. (R. 434) She indicated smoking helps relieve her anxiety and stress. (*Id.*)

5

Bowers stated she also has problems with anger. She gets frustrated easily, and if things do not go her way, she will "get really angry and upset and cry and scream if [she has] to." (R. 426) This often arises when she is driving, and she becomes frustrated with other drivers on the roadway (something the ALJ noted is not abnormal, R. 27). When her anxiety or anger level becomes overwhelming for her, she will call her mother or a friend and ask them to take her children for awhile. She stated she can only care for her children for a couple of days at a time before she begins to feel frustrated and depressed and she has to have a break. Because of her anxiety when she is around people, she does not take her children for walks, to the park, or swimming, and she makes excuses to her children to avoid having to attend their school. (R. 426-27) On the weekends, her children generally visit their grandparents, her brother, or her aunt. (R. 434)

Bowers indicated that when she was working, she had problems dealing with coworkers and supervisors. She would think others were talking about her or they thought she was doing a bad job, and she would become upset and either blow up at people or walk out of the job. She stated she was never fired from a job, but she walked out of several jobs and did not return. (R. 427-48) She missed a lot of work because she was unable to get herself up and out of the house, and she had problems dealing with customers because of her anxiety when talking with people. She sometimes made up excuses to leave work due to symptoms from her depression. (R. 431-32)

Bowers stated she has problems sleeping, and she wakes frequently during the night. She gets six hours of sleep at the most. (R. 427) She has problems with self care, eating properly, and caring for her personal hygiene regularly. (R. 428) On a typical day, she will talk with her children, and possibly do very minimal housework. She stated her children do most of the household chores and yard work. She does laundry when her children run out of clean clothes to wear, and she goes grocery shopping about once a

week for about ten minutes, getting in and out as quickly as possible.  She spends most of her day just sitting.  (R. 429)

Bowers sometimes gets short of breath.  She indicated she has asthma, for which she uses an albuterol inhaler.  However, she acknowledged she also smokes.  She indicated she sometimes gets short of breath during a panic attack, and she usually gets out of breath when she walks up and down stairs or carries a basket of clothes up the steps.  (R. 430)

Bowers used to get migraines frequently, and she has medication to use if she has a migraine, but she indicated she had not had a migraine for a couple of years prior to the ALJ hearing.  (R. 431)

Doctors have advised Bowers to do some type of regular exercise to help control her weight, but she does not exercise.  (R. 433)

Charlene Piper testified she has known Bowers since they became neighbors, about eight years prior to the ALJ hearing.  She sees Bowers every day.  Piper is disabled due to a spinal injury and she does not drive, so she often goes places with Bowers.  She has observed that Bowers has difficulty moving for awhile after she has been driving, and her complaints of back pain increase.  (R. 435-36, 438)

Piper stated that when Bowers was working, she sometimes asked Piper to call and tell Bowers's employer that she was unable to go to work.  She also would call Piper from work because Bowers felt she was "going to lose it."  Bowers would be crying and she would ask Piper to call her work and say there was some emergency so Bowers could leave and go home.  Piper has heard Bowers talk about committing suicide.  She has observed that Bowers is not able to deal with being around people, including family members.  She related an incident when Bowers came to a children's birthday party at Piper's home.  Bowers's daughter played in a sand pile and got dirty, and, according to Piper, this "just pushed her over the edge[.]"  (R. 436)  Piper stated she can tell when Bowers is becoming overly stressed because Bowers will start shaking.  (R. 437)

Piper has observed that Bowers has difficulty dealing with her children. According to Piper, Bowers "has two or three attacks each day." (*Id.*) She indicated Bowers's children are gone frequently, visiting their grandmother or others. Bowers has told Piper she feels guilty about not being able to go out and do things with her children. (*Id.*)

## 2. Bowers's medical history

### a. Mental health history

The record indicates that as of January 2000, Bowers carried a diagnosis of Major Depression with a GAF of 50 (R. 177), indicating serious symptoms or a serious impairment in functioning. *See* DSM-IV at 32. J.A. Jackson, M.D. prescribed the antidepressant Zoloft. (R. 177) The Zoloft dosage was increased on April 19, 2000, due to an increase in Bowers's symptoms of depression following the birth of her third child. Bowers's GAF was assessed at 55, indicating moderate symptoms. (R. 176) Bowers next returned for follow-up on January 10, 2001. She reportedly was symptom-free as long as she was compliant in taking her medication daily. (R. 175)

Bowers saw a doctor for follow-up on April 12, 2001. She reported "feeling very overwhelmed recently as she has three children and has started working for the first time in an extended period of time." (*Id.*) She also reported feeling anxious. Doctors gave Bowers samples of Buspar, an anti-anxiety medication, and scheduled her for follow-up in four days. They suggested Bowers obtain individual psychotherapy but Bowers "refused to pursue" therapy. (*Id.*) Bowers failed to show up for her scheduled appointment on April 16, 2001. She called the doctor's office on April 17, 2001, asking for an excuse to miss work. Notes indicate she was "angry and hostile and name calling," and "yelled obscenities" at the staff. (R. 174) She was advised that she would have to keep her scheduled appointments, and an appointment was scheduled for the next day. Dr. Jackson left samples of Seroquel, an anti-psychotic medication, for Bowers to pick up. (*Id.*)

Bowers appeared for her appointment on April 18, 2001, and the following history was taken:

> Tamela presents at the clinic requesting a work excuse. Claims medication Dr. Jackson gave her yesterday caused her to feel dizzy and tired. Tamela was reminded that she has missed both appts. she set up the last two days and it is unacceptable then to call screaming and swearing, demanding attention, Tamela excuses her behavior stating, "That's just how I get when I can't deal with things." Feels overwhelmed caring for children and working. Refuses therapy stating it doesn't help her. Admits readily she is not med compliant – "I just forget." States cannot even remember when the last time was that she took her antidepressant.

(R. 173) Dr. Jackson stressed to Bowers the importance of remaining compliant with her medications and appointments. He prescribed Zoloft at a higher dosage level and wrote her a work excuse for the 17th and 18th. (*Id.*)

Bowers saw Dr. Jackson for follow-up on May 16, 2001. He noted she was "feeling quite dysphotic," and secured Bowers's agreement that she would not harm herself. Her Zoloft dosage remained unchanged, and the doctor added Zyprexa, an anti-psychotic drug with mood stabilizing properties, to her medication regimen. Her GAF was assessed at 45, indicating serious symptoms. A follow-up appointment was scheduled in one week. (*Id.*)

Dr. Jackson saw Bowers on May 23, 2001. She had been compliant with her Zoloft, and had been taking Zyprexa as needed for sleep disruption. Her GAF was assessed at 58, indicating moderate symptoms. Bowers was referred for individual therapy. (R. 172) Bowers returned for follow-up on June 27, 2001. She appeared to be doing well and her medications were continued without change. Her current GAF was assessed at 45, indicating serious symptoms. (*Id.*)

Bowers had her first session with therapist Paula K. Linnevold on July 18, 2001. Notes indicate Bowers had overdosed on Zoloft on June 16th, taking 1200 mg. Bowers

stated "everyone" thought she should talk with a therapist. She indicated she needed to work and she would like to return to school but she felt "stuck in her life." She had difficulty coping with child care and working. Her family was providing her with financial support. The therapist opined there was "no way" Bowers could handle work and school at the same time. She urged Bowers to apply for disability, noting Bowers "has a history of mental health issues back to childhood." (R. 171) Linnevold's diagnoses were Major Depressive Disorder, recurrent, and an apparent Dependent Personality Disorder, with an "old history of oppositional defiant disorder." (*Id.*)

Bowers went to Dr. Jackson's office on July 20, 2001, and reported she had overdosed on Zoloft on the 16th. Bowers stated she did not want to die; she just wanted to sleep for awhile. Notes indicate Bowers was "surly and petulant." She reported feeling exhausted all the time, and stated she "has to have something for her mood and depression." (R. 170) She reported forgetting to take her medications frequently, and she was not taking any medication currently. Dr. Jackson discontinued the Zoloft and gave Bowers samples of Paxil, an antidepressant. He directed Bowers to return in one month. (*Id.*) Bowers returned on August 15, 2001. She was tearful and stated she felt "quite depressed." (*Id.*) Her GAF was assessed at 42, indicating serious symptoms. The doctor increased the Paxil dosage and added Klonopin, a drug used to treat panic disorder. (*Id.*) She was directed to return in one month, but the record does not indicate she complied. She called the doctor's office on November 16, 2001, stating she had been feeling "somewhat depressed," and she also was feeling anxious around other people. Her Paxil dosage was increased. (R. 169) On December 4, 2001, the doctor prescribed five refills of Paxil. He assessed Bowers's GAF at 45, indicating serious symptoms. He directed Bowers to return for follow-up in three months. (*Id.*)

At her next appointment, on March 15, 2002, Bowers stated she felt the Paxil was not helping her. She complained of restlessness and general unhappiness, as well as

anxiety. The doctor prescribed a gradual tapering down of the Paxil for three weeks until it was discontinued, and then a trial of Effexor, another antidepressant. (R. 168) On May 3, 2002, Bowers called to report the medication was not working, and Dr. Jackson prescribed a trial of Prozac, another type of antidepressant. (*Id.*) She saw Dr. Jackson on May 10, 2002, and he continued the Prozac, prescribing five refills. Bowers's current GAF was assessed at 45, continuing to indicate serious symptoms. (R. 167)

Bowers's medication apparently was switched back to Zoloft at some point because notes from her next follow-up visit on August 30, 2002, indicate she was taking Zoloft at that time. Bowers was "feeling quite depressed," and notes indicate she was "somewhat agitated during the interview." (*Id.*) Her Zoloft dosage was increased. Her current GAF was assessed at 40, which borders on major impairment in more than one area of functioning. (*Id.*; *see* DSM-IV at 32) It appears Bowers resumed taking Prozac at some point. Notes from September 27, 200, indicate her Prozac dosage was increased at that time. (R. 166)

On November 12, 2002, Bowers called Dr. Jackson's office in tears, requesting an "emergency consult." The previous evening, police were called when Bowers was found "sitting on the railroad track as a suicidal gesture." (*Id.*) She was seen at the emergency room and released. She appeared at the doctor's office minutes after her phone call, still "very tearful," and gave the following history:

> [Bowers] says she has had poor sleep, crying spells, and her boyfriend [sic] of 10 years moved out on Saturday. Last evening when she was to be at work, her children were at her Mom's home. Tamela became distraught and suicidal but she is quick to point out that she did not think that she would have let the train actually run over her. She admits to transient suicidal ideation without plan or intent at this time.

(*Id.*) M.E. Lassise, M.D. saw Bowers. He discontinued the Prozac and started Bowers on Lexapro, another antidepressant medication. He persuaded Bowers to restart individual counseling, and directed her to return in one week for follow-up with Dr. Jackson. (*Id.*)

Bowers saw Dr. Jackson on November 19, 2002. She stated she was feeling better and was less tearful, but she still felt a lot of stress. She indicated she had lost her job because Dr. Lassise would not write her a work excuse. No changes were made to her medications, and she agreed to continue with her individual therapy sessions. (R. 165) Bowers was next seen on February 14, 2003. Her mood was good and she was taking her Lexapro. Her current GAF was assessed at 45, continuing to indicate serious symptoms. (*Id.*)

Bowers returned for follow-up on March 26, 2003. She was "angry and tearful," noting she had gained about fifteen pounds. She reportedly was hyperthyroid and had been treated with radioactive iodine and thyroid replacement medication. Notes indicate Bowers "blame[d] her physician and her thyroid replacement medication for the weight gain and petulantly state[d] she [would] either just quit her medication or quit eating." (R. 164) However, her family doctor indicated her thyroid levels were decreasing on the medication. Bowers reported feeling irritable and stated she did not want to be seen in public at her current weight. She indicated she did not stay in touch with friends because she was "so upset and irritable." (*Id.*) Dr. Jackson recommended Bowers increase her exercise and cut down on calories, but notes indicate she was "not willing to even discuss a reasonable treatment plan." (*Id.*) Dr. Jackson continued Lexapro unchanged and directed Bowers to "return in one month or call if in a crisis situation. Tamela angrily huffed out of the office when told this plan." (*Id.*)

Dr. Jackson saw Bowers for follow-up on May 12, 2003. Bowers complained of "wild mood swings," and the doctor added diagnostic impressions of "Mood Disorder [not otherwise specified]," and "Rule out Bipolar Disorder." (*Id.*) He assessed her current

GAF at 40. He continued her on Lexapro, and added a trial of Trileptal, an anti-convulsant medication with mood stabilizing properties.[1] (*Id.*) Dr. Jackson increased the Trileptal dosage on July 21, 2003. Bowers's GAF assessment remained at 40. (R. 163)

At Bowers's next follow-up visit, on August 18, 2003, she stated her mood was poor and she felt "fairly irritable." (*Id.*) No changes were made in her medications. Her current GAF was assessed at 45. (*Id.*) Her Lexapro dosage was increased on November 10, 2003. (R. 161)

On January 11, 2004, Dee Wright, Ph.D. reviewed the record and completed a Mental Residual Functional Capacity Assessment form (R. 178-81), and a Psychiatric Review Technique form (R. 182-96).[2] Dr. Wright found that Bowers's recent history contained no "evidence of disorder of thinking in [her] presentation," and she was stable on her present medications. (R. 196) He noted Bowers reportedly maintained independent grooming and hygiene, and she performed regular household tasks such as "laundry, dishes, changing the sheets, taking out the trash, and vacuuming and sweeping"; preparing simple meals; and grocery shopping as necessary. (*Id.*) She reportedly drove daily, but "she would not take public transportation because of some anxiety being around unfamiliar individuals." (*Id.*) Although the doctor observed Bowers has problems with attention and concentration for extended periods when she is unduly stressed, he found her "capable of sustaining a range of cognitive activity from simple to moderately complex without serious limitations of function." (*Id.*) Dr. Wright found Bowers to have a medically-determinable mental impairment consisting of a depressive disorder NOS, which caused moderate restrictions of functioning for her but did not meet the Listing level of severity. (*Id.*)

---

[1]*See, e.g.*, http://www.mcmanweb.com/bpfaq2.htm.

[2]In Dr. Wright's review summary, the doctor lists Bowers's alleged onset date as 05/04/2001. (R. 196) The court is unable to determine the source of this erroneous date.

On March 3, 2004, John C. Garfield, Ph.D. reviewed the record and concurred in Dr. Wright's assessment. (R. 182)

Bowers saw Dr. Jackson for follow-up on April 30, 2004. Bowers was still taking Lexapro, but she stated the medication was not working. She and the doctor discussed the various medications Bowers had tried. She stated some of them helped her symptoms for awhile, while others were not beneficial at all. Notes indicate the following: "[Bowers] is demanding and blaming of the Dr. for not prescribing a medication she is satisfied with and is unreasonable and childlike in her expectations to be almost immediately symptom free." (R. 376) The doctor noted the following impressions from the interview:

> Tammy is very angry and verbal throughout this appt. She is loud, sarcastic and blaming. Her eye contact is very poor and she fidgets in her chair. She states she is angry and depressed and her medication doesn't work. She says she isolates herself in the house, has no energy or motivation and cries all the time. She is sleeping at night and feels tired all day. She reports she is ravenous and thirsty often. Tammy admits to suicidal thinking everyday, but states she would never hurt herself because she has three children to raise. She says she yells and screams all the time, but not at her children, stating, "my mom helps me out a lot."

(*Id.*) Dr. Jackson discontinued the Lexapro and started Bowers on Zyprexa and Artane, a tranquilizer. (*Id.*)

On July 15, 2005, a month prior to the ALJ hearing, Bowers underwent a psychiatric evaluation by Dr. Lassise, who noted Bowers had been followed by Ronald Larsen, M.D. and Dr. Jackson. By this time, Bowers was being treated with Cymbalta and Depakote, and Bowers stated she was "doing fairly well" on those medications. (R. 373) From the evaluation, Dr. Lassise's diagnostic impressions of Bowers included Major Depression, Recurrent; Mixed Personality Disorder; Asthma, Hypothyroid, Chronic Back Pain; and Recurrent Mood Difficulties. Bowers's current GAF was assessed at 48. (*Id.*)

Dr. Lassise referred Bowers to a therapist for individual counseling, and Bowers had her first therapy session on August 19, 2005. (R. 374-75) The therapist noted Bowers reported taking Depakote, Concerta, and Abilify – medications "not in accord with Dr. Lassise's note." (R. 375) Bowers reported symptoms of depression, anxiety, and agoraphobia. She indicated she had tried therapy before but it had not helped. The therapist planned to assist Bowers in reducing her symptoms, increasing her social interactions and support system, taking her medications as prescribed, and clarifying her diagnoses. (*Id.*)

### b.    *Physical health history*[3]

On January 27, 2000, Bowers saw Lisa Hedrick, PA-C for a flairup of her asthma. Notes indicate Bowers was thirty weeks pregnant with her third child and she was becoming increasingly breathless. She had been to the emergency room on January 17, 2000, where she was treated with a nebulizer. Bowers reported her breathlessness occurred on exertion and also when she was lying down. She also reported reflux and heartburn symptoms, and some left-sided upper back pain. P.A. Hedrick noted Bowers continued to abuse tobacco, and she recommended Bowers stop smoking immediately. (R. 322-23) She noted Bowers "makes a lot of excuses for this but does continue to smoke." (R. 323) She recommended Bowers not take Azmacort during her pregnancy due to the uncertainty of its effects on the fetus. She also suggested Bowers eat small meals and "practice anti-reflux measures." (*Id.*)

On March 6, 2000, Bowers, who was then thirty-five weeks pregnant, called her doctor complaining of extreme pain on the left side of her back, and shortness of breath. She stated she heard a "crack" after a coughing spell, and then her symptoms started. Her

---

[3]The court notes the administrative record contains one page of medical history related to someone other than the claimant in this case. (*See* R. 156)

doctor directed her to go to the emergency room for assessment. (R. 321) There is no further evidence of this incident in the record.

Bowers saw P.A. Hedrick on April 11, 2000, complaining of migraine headache. She had delivered her baby two weeks earlier, and her breathlessness had resolved after the birth. Her obstetrician had given her Depo-Provera for birth control, and P.A. Hedrick noted this could exacerbate Bowers's migraines. Bowers apparently had been prescribed Imitrex for migraines during her pregnancy, and the medication had worked well. P.A. Hedrick prescribed Maxalt MLT and suggested Bowers consider other forms of birth control. (R. 320) Bowers called the next day complaining that the Maxalt was not working. P.A. Hedrick prescribed Midrin. (R. 319)

On May 26, 2000, Bowers saw a nurse practitioner at her doctor's office with complaints of lower back pain. Notes indicates Bowers was "primarily a patient of Patrick T. Dunlay, DO." (R. 318) Bowers was diagnosed with a urinary tract infection and was treated with antibiotics. (*Id.*)

On September 27, 2000, Bowers saw Dr. Dunlay with complaints of persistent fatigue since the birth of her child six months earlier. She also complained of getting sweaty while walking upstairs. Dr. Dunlay ordered a thyroid panel and other lab tests. He also noted Bowers's fatigue could be due to depression. (R. 316-17)

Bowers was seen on October 9, 2000, for an upper respiratory infection. She was treated with antibiotics. She refused to use a nasal inhaler. (R. 315) She was treated for another urinary tract infection on November 20, 2000. (R. 314) She was treated for another upper respiratory infection on December 28, 2000. P.A. Hedrick again told Bowers she needed to stop smoking, and she noted Bowers was "not interested in doing this at this time." (R. 312-13) Bowers was treated for another upper respiratory infection on May 21, 2001. (R. 311) She failed to show up for a follow-up appointment on May 31, 2001. (R. 310)

Bowers saw P.A. Hedrick on September 27, 2001, complaining of a cough, chest congestion, and breathlessness. She had a slight fever. She was diagnosed with probable bronchitis and was treated with antibiotics. Notes indicate she declined to make a follow-up appointment in two weeks, but stated she would return if her symptoms did not resolve. P.A. Hedrick suggested a chest x-ray due to Bowers's positive smoking history. (R. 308) In addition, P.A. Hedrick talked with a doctor about possible drug interactions between Imitrex and Paxil. Because Bowers only required Imitrex "about twice a year," the doctor approved use of Imitrex for Bowers's breakthrough migraines. (R. 307-08)

On December 6, 2001, Bowers was treated with antibiotics and a decongestant for sinusitis, and with Cortisporin Ophthalmic drops for left conjunctivitis. (R. 306) Bowers returned on December 21, 2001, with continuing sinus symptoms. She stated the Doxycycline she had been prescribed two weeks earlier had not helped her symptoms at all and made her nauseous. She received a prescription for Amoxicillin. She continued to decline to use a nasal spray. (R. 305) Bowers was treated again for sinusitis, as well as for right otitis media, on March 26, 2002. (R. 304)

Bowers saw P.A. Hedrick on April 12, 2002, complaining of persistent fatigue for one week with "a dull temporal headache," loss of appetite, occasional dizziness, lack of energy, and stress. P.A. Hedrick believed Bowers's symptoms were due to either her depression or her medications. She ordered tests to rule out diabetes, thyroid disease, and anemia, and consulted with Dr. Jackson, Bowers's psychiatrist. (R. 303)

Bowers again was treated for an upper respiratory infection on April 24, 2002. She apparently agreed to try a nasal spray because Flonase was prescribed. (R. 302)

On May 23, 2002, Bowers saw P.A. Hedrick with complaints of left-sided back pain in the lower lumbar area. Bowers had not noticed any cause for the sudden onset of the pain. She stated the pain was worse when she was sitting but otherwise, nothing seemed to make the pain better or worse. She was diagnosed with "musculoskeletal back

pain which [was] totally reproducible on palpation." (R. 301) She was treated with Ultracet and Skelaxin. (*Id.*)

On May 27, 2002, Bowers called Dr. Dunlay to report that Bactrim was giving her a headache. The doctor switched her to Cipro. (R. 300) Bowers missed her scheduled appointment on June 6, 2002. (R. 299) Her prescription for an albuterol inhaler was refilled on July 16, 2002. (R. 298)

On July 31, 2002, Bowers requested a work release for the previous day. She stated she had not gone to work due to a migraine headache. She was given a work release for July 30, 2002. (R. 297)

On August 13, 2002, Bowers's doctor refilled her prescription for Skelaxin. (R. 293) On August 19, 2002, Bowers saw William J. Riesen, M.D. with complaints of left lumbar back pain, with slight radiation down the back of her left leg. She was diagnosed with muscular back pain. Lab tests ruled out a urinary tract infection or pregnancy. The doctor provided Bowers with a book on back care, and he recommended warm compresses and vapor rub. (R. 294-95)

Bowers was seen in the emergency room on September 4, 2002, "for electric shock of 750 volts while she was at work." (R. 292) She was experiencing headaches, body aches, and nausea. She was advised to follow up with her family doctor if her symptoms did not resolve. (*Id.*)

Bowers obtained a refill of her albuterol inhaler prescription on October 16, 2002. (R. 291) On November 4, 2002, she was treated with antibiotics and inhalers for sinusitis/bronchitis. (R. 290) She called the next day complaining of nausea and vomiting, and she was given a work release for the day. (R. 289) On November 12, 2002, she received a refill of her prescription for Imitrex. (R. 288) She was treated on December 10, 2002, for a probable virus, with complaints of nausea, body aches, chills, and fever. (R. 287)

Bowers called her doctor on December 23, 2002, stating she was beginning to develop a migraine headache. She described symptoms of "tunnel vision, flashing lights, and spots before her eyes." (R. 286) She apparently had experienced a reaction to Imitrex previously and requested a different medication. The doctor prescribed Maxalt. (*Id.*) The prescription for Maxalt was refilled on December 26, 2002. (R. 285)

Bowers was seen in the emergency room on or about December 23, 2002, "with a heaviness in her chest, being out of breath with just minimal exercise." (R. 284) She saw P.A. Hedrick for follow-up on December 30, 2002, with complaints of "being warm all the time," some weight loss, increased migraine headaches, and general malaise. She was tachycardic, but with regular rhythm between 104 and 114 beats per minute. Bowers was diagnosed with possible thyroiditis and lab tests were ordered. She received a prescription for Toprol, an anti-hypertensive agent, to treat her tachycardia. (*Id.*) Bowers's lab tests were positive for diagnosis of hyperthyroidism. She was scheduled for follow-up with Dr. Riesen, and was directed to continue taking the Toprol. (R. 283)

On January 2, 2003, Bowers saw P.A. Hedrick with complaints of jitteriness and tremulousness. She had not taken her Toprol that day, and P.A. Hedrick increased the dosage and stated it was "critical" that Bowers take the medication. Bowers was scheduled for further thyroid testing. She was advised to go to the emergency room if her symptoms worsened. (R. 282)

Bowers called P.A. Hedrick on January 3, 2003, complaining of being "very weak, tired, and dizzy," with a very fast heartbeat. P.A. Hedrick directed her to go to the emergency room. (R. 277) Bowers saw Thomas P. Delaney, M.D. in the emergency room with complaints of shortness of breath and neck soreness. She gave a history of smoking at least a pack of cigarettes daily. Dr. Delaney noted the following from his interview with Bowers:

> I explained to her that we needed to do a pulmonary function
> test on her or at least a peak flow, and she became quite irate

19

at the thought of this and said that she was being insulted for
her smoking and refused any further evaluation. She left the
emergency room before any further evaluation could be done.

(R. 281) Bowers also refused to allow any further thyroid testing at this time. (*Id.*)

On January 9, 2003, Bowers saw Dr. Riesen with complaints of tremor and
palpitations together with some fatigue. She stated her tremor had worsened over the
previous month to the point that she was having difficulty writing her name. She also
complained of achiness in her legs. She was diagnosed with Graves' disease, and the
doctor discussed various treatment options with her. He suggested it would be helpful to
treat Bowers's anxiety, and he prescribed Lorazepam twice daily. He recommended
pulmonary function studies, which yielded favorable results. As a result, Dr. Riesen
called Bowers on January 10, 2003, and directed her to cut back on using her albuterol
inhaler, which he opined would help her tremor and palpitations. He planned to see her
frequently for follow-up as they began treatment for Bowers's hyperthyroidism. The
doctor recommended treatment with radioactive iodine as an alternative to a thyroidec-
tomy. (R. 278-80)

Bowers called Dr. Riesen on January 11, 2003, to report that she had a slight fever.
She noted her child was ill with an upper respiratory infection, and Bowers herself had a
runny nose. The doctor suspected the fever was due either to "a minimal viral illness or
perhaps to the hyperthyroidism." (R. 276) Bowers was directed to call if her symptoms
worsened. (*Id.*)

Dr. Riesen saw Bowers on January 13, 2003, for follow-up of her hyperthyroidism.
Bowers agreed to go forward with radioiodine therapy. (R. 275) She saw Dr. Riesen for
follow-up on January 27, 2003, and reported her tremor and shakiness were improved.
She reported "no resting breathlessness or breathlessness with minimal exertion," but she
did feel "winded" when taking clothes down to the basement. The doctor opined Bowers's

fatigue was "[p]robably multifactorial with components from her depression and Toprol, as well as the thyroid disorder." (R. 273

Bowers returned for follow-up on February 17, 2003. She had run out of her Lexapro three days earlier, "apparently due to a miscommunication with psychiatry," and Bowers was "angry and upset about this." (R. 271) She stated she became irritable after only a brief period off her Lexapro, and she was sleeping during the day but poorly at night. Dr. Riesen opined getting Bowers back on Lexapro would help her symptoms. He also noted Bowers "may have had inflated expectations about the affects [sic] of thyroid treatment." (*Id.*)) He encouraged Bowers to be patient, noting the effects from her thyroid treatment could take several months. (R. 272) Bowers's lab results showed favorable results from her treatment, and on February 18, 2003, Dr. Riesen prescribed Levothyroxine. He also prescribed Zantac 150 mg. for Bowers's heartburn symptoms after eating. (R. 270)

Bowers saw Dr. Riesen for follow-up on March 17, 2003. She reported feeling fatigued and discouraged. She had gained fifteen pounds and felt she was "grossly overweight" and "a 'fat, horrible, ugly person.'" (R 268) The doctor ordered a recheck of Bowers's thyroid levels, noting he believed "it would be psychologically important for her to know how she stands." (*Id.*) He noted Bowers might have ongoing difficulty with her weight in light of her family history. (R. 269) Based on Bowers's lab results, the doctor increased her Levothyroxine dosage. (R. 267)

Bowers saw Dr. Riesen again on April 18, 2003. She complained of lumbar pain which she stated had worsened since she had started a job at the beginning of March. Notes indicate Bowers had seen an orthopedics specialist a year earlier, when she "was felt to have spondylolisthesis," and the doctor recommended a brace. Bowers indicated she was not using the brace because she had difficulty fitting her clothing over it. She

requested another appointment with orthopedics, and an appointment was scheduled at the end of May. Dr. Riesen ordered new x-rays of Bowers's lumbosacral spine. (R. 263-64)

X-rays of Bowers's lumbosacral spine taken on April 24, 2003, showed "[p]robable bilateral spondylolysis at L5"; "Grade 1 spondylolisthesis at L5-S1 with possibly some minimal retrolisthesis at L4-5"; and "[e]arly disk space narrowing at L5-S1." (R. 337)

Bowers saw Dr. Riesen on April 28, 2003, with complaints of teeth and gum pain, neck pain on the left side, and ongoing back pain. She denied any leg pain. The doctor recommended warm compresses and vapor rub for the neck and back pain. Bowers declined physical therapy. Dr. Riesen referred Bowers to the Mercy Pain Clinic. (R. 261-62)

Bowers saw Dr. Riesen again on May 16, 2003, continuing to complain of lumbar back pain without leg symptoms. She described the pain as severe and stated it impaired her ability to function, including causing her problems getting out of a chair and doing housework. She stated muscle relaxers were not helpful. Dr. Riesen prescribed a short course of Lortab pending Bowers's appointment at the Pain Clinic. (R. 259-60)

On May 23, 2003, after reviewing lab results, Dr. Riesen increased the dosage of Bowers's thyroid medication. (R. 258)

On May 28, 2003, Bowers saw Richard L. Wilson, M.D. at the Mercy Pain Clinic for a consultation upon referral from Dr. Riesen.[4] Bowers complained of non-radiating, midline low back pain that had "worsened since she was about eight years old," when she first was diagnosed "with a Grade 1 spondylolisthesis and . . . spina bifida occulta." (R. 256) Dr. Wilson reviewed Bowers's x-rays, which he noted "confirmed the presence of some degenerative disease, the spina bifida occulta, and the resultant spondylitis and spondylolisthesis." (*Id.*) Dr. Wilson noted Bowers appeared somewhat nervous, anxious,

---

[4]Curiously, when Dr. Wilson initially asked Bowers why she was there to see him, she responded, "I have no idea." (R. 256)

and "almost manic." (*Id.*) Upon examination, the doctor noted "a slightly exaggerated lordosis likely from the spondylolisthesis and from her relative obesity," and "pain on direct palpation over the area of the low back approximately corresponding with the spondylolisthesis." (R. 257) He counted Bowers's Lortabs and noted she was taking the medication as prescribed, and she was not a good candidate for anti-inflammatory medications. He opined there was no surgical procedure warranted, noting "a Grade 1 spondylolisthesis of spina bifida occulta is essentially a stable disorder. It certainly has the potential to be painful, and it certainly has the potential to cause some degeneration which seems to have occurred." (*Id.*) He prescribed Lortab and directed Bowers to return for follow-up in several weeks. (*Id.*)

Bowers returned to see Dr. Wilson on June 19, 2003. She stated her pain level was "reasonable" with the Lortab. The medication caused her mouth to be dry, but otherwise she had no significant side effects. Dr. Wilson noted Bowers's anxiety level likely "complicate[d] her back pain significantly, both in the treatment and in the presence of it." (R. 254) He continued her on the Lortab. (*Id.*)

Bowers saw Dr. Wilson again on July 17, 2003. She reported a pain level of three out of ten, and indicated she took Lortab about three times daily as needed for pain. She complained of poor sleep, which the doctor noted to be "a hallmark of chronic pain syndrome." (R. 253) He added Flexeril to her medications. (*Id.*)

Bowers saw Dr. Riesen for follow-up on July 23, 2003. She complained of some numbness of her hands for about six months, and indicated she had chosen not to mention the problem previously. She stated she tended to sleep with an arm under her pillow, and she would awaken with numbness in her arms that would subside over five to ten minutes. She also experienced occasional numbness during the day. She also complained of some left leg discomfort upon arising from a chair. Her breathing was worse, which she attributed to a recent increase in smoking. Dr. Riesen advised Bowers to try to sleep

without her arms up. He ordered lab tests to recheck Bowers's thyroid level. (R. 251-52) After reviewing the lab results, the doctor increased the dosage of Bowers's thyroid medication. (R. 248)

Bowers saw Dr. Wilson for follow-up on August 15, 2003. She stated her low back pain was under reasonably good control. The doctor added some Ultracet at bedtime to try to help Bowers sleep better. In addition, he started Bowers on a low dose of an anti-inflammatory drug. (R. 249)

When Bowers returned to see Dr. Wilson on September 5, 2003, she reported increased pain. By Bowers's report, her activity level was "high," and her level of functioning was "pretty good." The doctor increased the anti-inflammatory and Lorcet dosage, and continued the Ultracet at bedtime. (R. 247) Bowers's next followup was on September 30, 2003. She stated the Ultracet was not helping much, and she was having financial difficulties affording her medications. Notes indicate Bowers "remains a little obese" but was "[f]airly spry." (R. 246) The doctor discontinued the Ultracet, and continued the anti-inflammatory and the Lortab. (*Id.*)

Bowers saw Dr. Riesen on October 22, 2003, for follow-up of her thyroid disorder. Bowers stated she was feeling "okay," and her pain was well controlled on her current medications prescribed by Dr. Wilson. She complained of low energy level and fatigue. Repeat labs were ordered, and her thyroid levels were normal. She was continued on her current medications, and was advised to consult with her mental health practitioner regarding her weight gain and fatigue. (R. 242, 244-45)

Bowers saw Dr. Wilson on October 29, 2003. She reported her pain was "reasonably well controlled" on her current medications. Notes indicate Bowers remained compliant with her doctor's medical recommendations. (R. 241) She saw Dr. Wilson again on January 7, 2004. She reported pain at a two to three out of ten. She was having

worse pain at night that was awakening her in the middle of the night and disturbing her sleep. The doctor added Zanaflex, a muscle relaxer, at night. (R. 236)

On February 2, 2004, Bowers saw P.A. Hedrick for an acute sinus infection. Bowers initially stated she thought she might have a bladder infection, but when she arrived at the clinic, she denied having any bladder symptoms. She stated her pain management with Dr. Wilson was not helping. Notes indicate some of Bowers's medications had been changed recently by her mental health care provider. Bowers was noted to be "quite anxious and somewhat agitated," stating she was unable to afford her medications and she just wanted to go home. (R. 235) P.A. Hedrick gave Bowers samples of an antibiotic and a decongestant. She advised Bowers to follow up with Dr. Wilson and Dr. Jackson about her other issues. (R. 233)

Bowers saw Dr. Wilson on February 11, 2004. She stated the Lortab was helping her back pain, and her pain was "chronic for about two to three hours." (R. 232) She was taking Lortab during the day but not at night, and she was having pain at night. The doctor added one Lortab at night to Bowers's medications. (*Id.*) When Bowers returned for follow-up on February 27, 2004, she stated the Lortab helped somewhat but it was not alleviating her pain for long enough. She complained of increasing back pain. She continued to take Zanaflex as needed. The doctor added OxyContin to her medications for a seven- to ten-day trial. (R. 231) On March 4, 2004, Dr. Wilson increased Bowers's OxyContin dosage, and she continued to take Lortab for breakthrough pain. (R. 230)

On March 10, 2004, J.D. Wilson, M.D.[5] reviewed the record and completed a Physical Residual Functional Capacity Assessment form. (R. 197-202) Dr. J.D. Wilson opined Bowers would be able to lift up to twenty pounds occasionally and ten pounds frequently; stand and/or walk for about six hours in an eight-hour workday; sit for about

---

[5]To distinguish between consulting physician J.D. Wilson, M.D., and Bowers's treating physician Richard L. Wilson, M.D., the court will refer to the consulting physician as "Dr. J.D. Wilson."

six hours in an eight-hour workday; and push/pull without limitation. He opined she could perform all types of postural activity occasionally, and she had no manipulative, visual, communicative, or environmental limitations. Dr. J.D. Wilson noted he had not reviewed a statement from any treating or examining source regarding Bowers's capacities. (*Id.*)

Bowers saw Dr. Richard Wilson on March 15, 2004, reporting "a lot of increasing pain in her back." (R. 229) The doctor was unable to find a cause during his examination. He increased Bowers's OxyContin dosage, noting Bowers remained in good compliance with her medications. (*Id.*) On April 7, 2004, Bowers reported the increased OxyContin dosage had "decreased her pain significantly." (R. 228) She was sleeping reasonably well, for about six hours at a time, and her pain level was a four out of ten. Her medications were continued without change. (*Id.*)

Bowers saw Dr. Riesen for follow-up of her thyroid disorder on April 28, 2004. She stated she had not felt well at any time recently, and she was not pleased with her psychiatric medicine program, noting she had experienced some irritability and a tendency to lose her temper. She also reported general fatigue and general malaise. She was advised to take these matters up with her psychiatrist. (R. 227) On May 3, 2004, Bowers was advised of her thyroid results and her Synthroid was increased. (R. 361)

When Bowers next saw Dr. Wilson, on May 5, 2004, she reported some morning stiffness. She stated the Lortab was not helping much for her breakthrough pain, but the OxyContin was helping significantly. The doctor substituted Percocet for the Lortab for a two-week trial. (R. 225)

Bowers saw P.A. Hedrick on May 13, 2004, with complaints of "just plain not feeling well." (R. 224) She reported body aches for about a month with fevers in the afternoon as high as 101 degrees, significant aching in her legs, and fatigue. She stated her back pain was not worse. She stated her antidepressant medication had been changed recently and it was contributing to her fatigue She was frustrated and depressed and was

scheduled to see a different psychiatrist in a few days. P.A. Hedrick changed Bowers's psychiatric medication to Abilify, and directed Bowers to stop taking an antispasmodic and a tranquilizer that had been prescribed by Dr. Jackson. She also ordered lab tests to try to determine a cause for Bowers's elevated temperature at times. (R. 223-24)

Bowers went to the emergency room on May 16, 2004, complaining of shortness of breath and racing heartbeat. After interviewing Bowers, she was treated with Ativan and Ibuprofen, and her symptoms resolved. She was diagnosed with an anxiety attack, resolved on Ativan, and chronic lower back pain that the doctor noted could have contributed to her tachycardia. (R. 264-67)

Bowers saw P.A. Hedrick on May 17, 2004, for follow-up after her emergency room visit. Bowers had been given Lorazepam in the ER which alleviated her symptoms; however, Bowers stated she had a low tolerance for Lorazepam, which made her very tired, and she expressed concern that she would not be alert when her children were home. P.A. Hedrick suggested Bowers stop taking all antihistamines, which she thought could be playing a role in Bowers's elevated heart rate. She prescribed a nasal spray instead and gave Bowers samples. She also gave her samples of Toprol to regulate Bowers's heart rate, and directed her to stop taking the Abilify until she saw the psychiatrist. (R. 221-22)

Bowers called P.A. Hedrick on May 19, 2004, complaining that her pulse was still high. P.A. Hedrick directed her to double her dosage of Toprol. (R. 360)

Bowers returned to see P.A. Hedrick on May 25, 2004. Notes indicate Bowers was "extremely extremely frustrated," and arrived "extremely agitated and yelling at [P.A. Hedrick]." (R. 219) Bowers had cancelled her appointment with the new psychiatrist. She complained of the following problems, which she stated had begun about two weeks earlier: low-grade fevers, dry mouth, weight loss, inability to eat due to constant nausea, constant headache, and weakness. P.A. Hedrick noted Bowers's lab results from the previous week all were normal. Bowers indicated she believed something was "seriously

wrong with her" and she was adamant that it was not her depression.  P.A. Hedrick ordered several additional tests, took Bowers off Toprol, and put her on a Holter monitor. (R. 218-19)  The Holter monitor results showed "[f]requent sinus tachycardia, but no other significant cardiac arrhythmias."  (R. 363)

Bowers called the doctor's office on June 1, 2004, to report she was not feeling any better and she continued to have a rapid heartbeat.  She was informed the Holter monitor was normal and she could start back on the Toprol.  She was scheduled for follow-up with P.A. Hedrick on June 3, 2004.  Bowers expressed anxiety about her condition and was told to use Lorazepam as needed.  (R. 217)

When Bowers saw P.A. Hedrick on June 3, 2004, she reported  continuing fatigue, general malaise, anxiety, and "a bit of a headache."  (R. 216)  She was restarted on Abilify and continued on the Toprol.  (R. 215-16)

Bowers returned to see Dr. Wilson for follow-up of her back pain on June 8, 2004. She reported increased pain, but "due to circumstances" she had missed an appointment with the doctor and had been out of OxyContin for at least twelve hours.  He restarted her on OxyContin and increased her Lortab dosage.  (R. 214)

Bowers saw P.A. Hedrick on June 18, 2004, "for a recheck of her mood disorder." (R. 213)  She was tolerating the Abilify but still complained of significant anxiety and racing heartbeat.  P.A. Hedrick consulted with Dr. Johnson and increased Bowers's Abilify dosage.  Bowers also complained of nausea and weight loss, but she was not interested in pursuing treatment.  (R. 213)

On June 22, 2004, Bowers's Lexapro was refiled.  Bowers complained of increased anxiety, agitation, and aching legs.  (R. 358)

Bowers saw Ronald Larsen, M.D. on June 28, 2004, for a second opinion regarding her medications.  He noted Bowers appeared "tense and dramatic," with anxious mood and

poor insight. (R. 212) He continued her on Lexapro and Ativan, decreased her Abilify dosage, and requested Bowers's old records for follow-up. (*Id.*)

Bowers returned to see Dr. Wilson about her back pain on July 28, 2004. Dr. Wilson's treatment notes from this visit are particularly descriptive of Bowers's overall condition, and as such they are reproduced here:

> Ms. Bowers returns today for followup. She has recently self discontinued OxyContin. She actually destroyed an entire bottle in our office and returns today reporting miserable low back pain. As of June 30, 2004 my records indicate that [Bowers] felt that her pain was well controlled at 3 out of 10, having some difficulty with some anxiety but otherwise her pain level was good. When confronted with this today, and the only interceding change has been the discontinuation of the OxyContin that she was on for this chronic degenerative back pain, she insisted that she had lied about her level of pain control because of her anxiety disorder and that she was too anxious to stay and discuss her situation. Unfortunately she has destroyed the OxyContin, which means that her baseline level of her medication she was on has cleared her system. She denies any frank withdrawal at this point but does admit to using Endocet 20 mg, two Endocet 10/650 three times a day, and this helps her pain for about two hours. From my perspective this pretty much maximizes the amount of Acetaminophen that she can take per day. On pill count today she has 131 Endocet.
>
> Unfortunately Ms. Bowers is appearing without any distress today. I explained to her that since she has self discontinued the OxyContin we really do not have the time remaining in my practice in Mason City and I am not confident enough of coverage of my clinic to start a retitration of either OxyContin or a different medication. I offered her a referral to a nearby pain center. Unfortunately nearby in this case is Fort Dodge, which is the closest pain clinic of which I am aware to Mason City. It was at that point she became remarkably tearful with the unrealistic expectation that surely there must be [s]ome doctor in another pain clinic closer to

Mason City than Fort Dodge. Unfortunately at this point there is not and again there has not been adequate coverage for my clinic to continue a titration like this, or at least take over a titration. I offered to make this referral and she initially accepted. She was given a prescription for OxyContin 40 mg b.i.d. along with the Percocet with the intent of making that referral. It was as she was leaving after she received her prescription that the patient refused referral and insisted that she was going to go back and see her primary care doctor, William Riesen, MD and/or Lisa Hedrick, PA-C for their counsel in this regard. Had I known she was going to refuse follow through with the full treatment plan of referral to a pain center for continued evaluation and treatment of this chronic back pain she would not have been restarted on OxyContin today, but that seems to have occurred anyway. As such, I continue to believe that this lady who obviously has an unstable condition along with an anxiety disorder should be treated by a pain clinic of some sort. This would be remarkably complex in my opinion to attempt in a general medicine practice given this admission to lying to those who are trying to help her and this sporadic and waxing and waning condition and complaint or willingness to complain of such. I will not refill her medications as she did not go through with the plan and unfortunately if she goes through with withdrawal, which she did not the first time so there is no reason to believe that she would on a lower dose, I continue to advocate that she needs to be followed in the pain clinic.

(R. 211)

Bowers saw P.A. Hedrick on August 25, 2004, for follow-up of her back pain. She expressed frustration because she had been referred to other pain clinics all of which were too far away to be of use. P.A. Hedrick had the benefit of Dr. Wilson's office notes from July 28, 2004. She discussed options with Bowers, and they agreed Bowers would see Sharon Enabnit, ARNP, who would be "taking over the pain clinic." (R. 210) P.A. Hedrick wrote Bowers a prescription for one refill each of OxyContin and Endocet, and informed Bowers she would have to get further refills from the pain clinic. (*Id.*)

Bowers saw Ms. Enabnit on September 15, 2004, for follow-up. She complained of pain on arising in the morning, and stated her pain varied from a two to a four or five on a ten-point scale. Bowers's "medication counts were right on target," and she was given refills of the OxyContin and Endocet. She set goals of having her pain level be less than or equal to five and overall satisfaction with her quality of life and functioning. (R. 209)

On October 12, 2004, Dr. Riesen decreased Bowers's Synthroid dosage. (R. 354)

Bowers returned to see Ms. Enabnit for follow-up on October 25, 2004. She stated her pain level averaged about four out of ten. She reported good pain relief for about three hours after taking her medications. Her pill count was on target and Ms. Enabnit saw "no signs of red flags or signs of any diversion or abuse." (R. 208) Bowers complained of occasional dull, aching pain in her legs, particularly when her back pain was at its worst. She awakened from sleep frequently, and attributed this to her depression and back pain. She stated she had lost thirty-five pounds in the previous two to three months. She was continued on her current medications. (*Id.*)

Bowers saw Dr. Larsen for medication follow-up on November 2, 2004. She continued to take her medications as directed. She expressed concern about what would happen to her on continued pain medications, and Dr. Larsen suggested she get a second opinion about her back at the University of Iowa. She was encouraged to stick with her medications until after completion of that evaluation. (R. 207) The record contains no evidence of an evaluation of Bowers's back condition at the University of Iowa.

Ms. Enabnit saw Bowers on November 29, 2004, for follow-up. Bowers continued to complain of low back pain, but stated her pain level had improved. Ms. Enabnit noted Bowers had more of her OxyContin pills remaining than she should have had, which made Bowers's improved pain level puzzling. She denied problems with sleeping, and stated she

had been able "to carry out all her activities of daily living without any problems." (R. 206)  She was continued on her current medications.  (*Id.*)

Bowers returned to see Ms. Enabnit on January 3, 2005.  She rated her pain at three to four out of ten.  She reported problems swallowing the Endocet, so she was switched to Oxycodone.  (R. 205)  Bowers returned for follow-up on February 2, 2005.  She reported less pain control with Oxycodone than with the Endocet; however, she elected to remain on the Oxycodone because she already was taking the maximum recommended dosage of Tylenol.  Her Oxycodone was increased.  (R. 204)

Bowers saw Ms. Enabnit again on March 9, 2005.  She rated her pain at a four out of ten.  She reported that her pain was under better control than it had been a month earlier.  Bowers stated she was increasingly forgetful since she had started taking Depakote.  She planned to follow up with a psychiatrist about this.  Ms. Enabnit suggested Bowers might want to begin seeing a counselor, but Bowers declined.  She indicated she felt her support system was good, especially her mother.  (R. 345)

Bowers saw Ms. Enabnit again on April 19, 2005.  She rated her pain at a two out of ten, with the pain located in her low back and the back of her left leg.  Bowers felt she had good pain control, she was sleeping well, and she was not experiencing side effects from the OxyContin and Oxycodone.  However, she continued to complain of increasing forgetfulness.  Her medications were continued without change.  (R. 344)

Bowers saw Dr. Riesen on May 3, 2005, for follow-up of her thyroid condition. Bowers reported having a "headache involving her eyes for about one week." (R. 350) The doctor suspected this was sinus related and he gave her samples of Zyrtec-D.  She complained of "some memory loss for the past several months," and wondered if this could be related to her Depakote dosage.  Dr. Riesen directed her to talk this over with her mental health provider.  He directed Bowers to have repeat thyroid testing.  (R. 350-51) When Bowers had not obtained new thyroid tests by May 16, 2005, Dr. Riesen had a nurse

contact her for scheduling. Bowers stated she would be in on May 20, 2005, for the lab work. (R. 348)

Bowers saw Ms. Enabnit on May 18, 2005, for follow-up of her chronic back pain. She again rated her pain level at two out of ten. She stated she was not sleeping as well as night, but she was "quite satisfied with her level of pain management at [that] time." (R. 343)

Bowers called the doctor's office on June 14, 2005, requesting her thyroid results. Dr. Riesen obtained Bowers's refill history from the pharmacy and learned Bowers had obtained refills in October and November 2004, and February and March 2005, suggesting Bowers was not always compliant with her medication. When confronted, Bowers insisted she took her medication every day, religiously, "except for recently because . . . 'Dr. Riesen did not refill her medication.'" (R. 347) She was advised of the importance of taking her medication regularly. She also was advised that she would have to follow up with Dr. Riesen and have repeat thyroid testing in eight weeks. Bowers "got very angry" with the nurse on the phone, stating she was "having trouble with her heart and anxiety" and she wanted to do her follow-up on the phone. She stated she would follow up with P.A. Hedrick. (*Id.*)

Bowers saw Ms. Enabnit on June 15, 2005, for follow-up. Bowers rated her low back pain at a three out of ten. She stated her pain would increase with activity such as lifting, walking, and going up and down stairs. She experienced some pain relief by decreasing her activity and changing position. Her medications were continued without change. (R. 342)

3.      *Vocational expert's testimony*

The ALJ noted Bowers is "an individual who is currently age 28, age 25 at the alleged onset date, . . . [with a] GED and no past relevant work that was SGA level." (R. 440) The ALJ then questioned VE George Brian Paprocki as follows:

> I'm going to give you some hypothetical scenarios. The first one would limit lifting to 20 pounds with 10 pounds being lifted frequently. Stand and sit six hours each in an eight-hour workday. The non-exertional physical limits would all be occasional only. Climbing stairs, ladders, balance, stoop, kneel, crouch, or crawl. We would limit – as far as mental limitations, we're going to limit to simple, routine, constant tasks. Only occasional interaction with the public and only occasional interaction with coworkers. If we assume an individual the same age, education, and work experience as Claimant with this residual functional capacity, are there any jobs that an individual with this profile could perform in the national economy?

(*Id.*)

The VE indicated the hypothetical individual would be able to work as a hotel and motel housekeeping cleaner, which involves simple, routine work with light lifting and only occasional stooping or bending. The job is performed mostly alone from room to room, so there is little ongoing contact with other individuals. (*Id.*) The VE also stated the individual could work as a commercial office helper, who "does things like distribute mail, stamp outgoing mail, make photocopies, do light filing, [and] a variety of short-term unskilled clerical tasks." (R. 441) The VE also opined the individual could work as a full-time photocopy machine operator. Overall, he opined the hypothetical individual could perform "a wide range of jobs in the light or sedentary category." (*Id.*)

The ALJ next asked the VE to consider the same individual but with the following limitations:

> [A]gain limiting lifting to 20 pounds with 10 pounds frequent. Stand and sit six hours, but I'm going to limit standing to 30 minutes at a time and sitting to 60 minutes at a time and with

> slight breaks. Non-exertional stays all occasional. Again, just
> simple, routine constant tasks. No changes in the work
> setting. No independent decisions. No interaction with the
> public and occasional interaction with coworkers. Would our
> hypothetical individual be able to perform jobs with these
> restrictions, or would it change?

(R. 442) The ALJ clarified that the individual would be able to stand for a total of six to eight hours, but only 30 minutes at a time and then would have to change positions for a short period of time. (*Id.*)

The VE indicated the hypothetical individual could still perform the clerical jobs he had listed in response to the first hypothetical question. He opined the housekeeping cleaner job would be precluded because a person would not be able to take the types of breaks contemplated in the second hypothetical question. (*Id.*)

The ALJ asked the VE to consider the same individual as in the second hypothetical question, but with the additional limitation that the individual would miss three or more days of work each month, and be unable to sustain an eight-hour workday due to anxiety. The VE indicated either of those factors – missing three days of work each month, or being unable to sustain an eight-hour workday – would preclude competitive employment. (R. 443)

In response to questioning by Bowers's attorney, the VE indicated that "occasional" contact with coworkers contemplated no more than one-third of the time. If the individual's contact with coworkers or the public was for a shorter period, the individual likely would be unable to perform the jobs listed in response to the hypothetical questions. However, the individual likely could work in assembly-type jobs that would not involve contact with coworkers or the general public. He further stated some assembly jobs would allow an individual to change positions from sitting to standing as needed. Examples of these types of jobs would include fishing reel assembler, lampshade assembler, toy assembler, or small parts assembler. (R. 444-45) Although these jobs mostly would be

performed in proximity to other employees, they would not involve actual contact with others. The VE indicated there are very few jobs that could be performed without some proximity to coworkers, so that type of restriction likely would eliminate competitive employment. (R. 446)

4. ***The ALJ's decision***

The ALJ found Bowers has no past relevant work, and she has not worked at the substantial gainful activity level since her alleged disability onset date of September 1, 2002. However, he found Bowers's work history since that date to be "an indication of involvement in a range of daily activity not consistent with disability from all work." (R. 22, citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994); R. 27).

The ALJ found Bowers "has sever impairments in combination which include depression, spondylosis and spondylolisthesis of th spine; obesity; hypothyroidism controlled by medication; [and] nonsevere asthma," but none of her impairments, singly or combination, meet the Listing level of severity. (R. 28 ¶ 2)

The ALJ gave great weight to the consulting opinion of Dr. J.D. Wilson in reaching his conclusions regarding Bowers's physical residual functional capacity ("RFC").[6] (*See* R. 24) The ALJ found Bowers's subjective complaints regarding the degree of limitation caused by her chronic back pain to be inconsistent with the medical evidence of record, in particular the objective findings of Bowers's treating physicians. (R. 24) He adopted Dr. J.D. Wilson's assessment of Bowers's RFC, with the additions that Bowers should

---

[6]In discussing the consultant reviews of Bowers's physical and mental capacity, the ALJ inserted what appears to be a "stock" phrase for this ALJ, indicating each of the consultants "made a careful note of the nature, location, onset, duration and frequency of symptoms alleged as well as alleged precipitating and aggravating factors." (R. 24; *see also* R. 26) He further indicated Dr. J.D. Wilson had made a "detailed medical analysis" of Bowers's capacity. (R. 24) The court finds these notations overstate the depth of analysis indicated in the consultants' reports. (*See* R. 197-202, Dr. J.D. Wilson's report; R. 178-96, forms completed by Dee Wright, Ph.D.)

perform only simple, routine tasks; have no changes in the routine work setting or a requirement for independent decision-making; avoid interaction with the public; and have only occasional interaction with coworkers. (R. 27)

Regarding Bowers's claim that she is disabled due to depression and anxiety, the ALJ found Bowers's condition has been well controlled on her medications. He noted Bowers was not always compliant with her medication regimen, and she declined counseling on occasion, stating she already had a good support system. The ALJ found this showed Bowers had "good control of her mental symptoms." (R. 25) He noted that although Bowers testified she has almost daily anxiety attacks, Bowers had not "persistently shared these seemingly significant symptoms with her treating sources throughout the time in question[,]" detracting from Bowers's credibility. (R. 26) The ALJ noted Bowers shops, visits with family, cares for her three children, performs some activities and directs her children in performing other activities. He indicated that although Bowers stated three of her jobs had ended due to her mental health issues, she had "never been fired because of mental symptoms." (*Id.*; R. 22)

Overall, the ALJ found Bowers's allegations regarding the extent of her limitations not to be fully credible. Based on the VE's testimony in response to the ALJ's hypothetical question, the ALJ found Bowers retains the RFC to perform unskilled jobs that exist in significant numbers in the national economy, such as office helper, photocopy machine operator, and assembly-type jobs, and she therefore is not disabled. (R. 27-28; R. 29 ¶ 9).

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, ___ F.3d ___, 2007 WL 2593631 at * 2 (8th Cir. Sept. 11, 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."

*Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work.

20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant

numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B.  *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole. *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the

Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004);

*Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding

the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

## *IV. DISCUSSION*

Bowers argues the ALJ's decision is not supported by substantial evidence in the record. She argues the ALJ improperly evaluated her subjective complaints, failed to make a proper *Polaski* analysis, and posed an inaccurate hypothetical question to the Vocational Expert. (*See* Doc. No. 8)

The Commissioner argues the ALJ made a proper *Polaski* analysis of Bowers's subjective complaints, and articulated the inconsistencies in the record upon which he relied in discrediting Bowers's subjective complaints. With regard to Bowers's mental impairments, the Commissioner argues the ALJ's findings regarding the extent to which Bowers's mental impairments restrict her activities are supported by the records of Bowers's mental health treatment. In addition, the Commissioner takes issue with Bowers's reliance, in her brief, on GAF assessments by her physicians, many of which were made prior to Bowers's alleged disability onset date. The Commissioner further argues the ALJ included the impairments and restrictions he found credible in his hypothetical question to the VE, and therefore the VE's testimony constitutes substantial evidence supporting the Commissioner's decision. (*See* Doc. No. 11)

Bowers responds by arguing the ALJ should have considered her mental health providers' GAF assessments as part of the longitudinal evidence the regulations recognize as "vital" to establishing the severity of a claimant's mental impairment. (Doc. No. 12 at 2, citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(2).) She argues it was error for the ALJ to rely more heavily on a single report from Dr. Larsen than on Dr. Jackson's long-term treatment history. (Doc. No. 12 at 2)

The Commissioner also argues the ALJ properly considered Bowers's insubstantial work history, noting "'[a] lack of work history may indicate a lack of motivation to work rather than a lack of ability.'" (Doc. No. 11 at 16, quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001).) Bowers argues the evidence supports a contrary conclusion here, suggesting her poor work history actually supports her claim that her mental impairments have prevented her from maintaining gainful employment. (*See* Doc. No. 12 at 3) She notes her earnings history shows she worked for more than twenty different employers from 1993 to 2002, and she wants to work, but she has been unable to maintain any employment for a sustained period. (*Id.* at 3-4)

The court finds substantial evidence in the record supports the ALJ's assessment of Bowers's *physical* residual functional capacity. The evidence indicates that although Bowers has chronic low back pain, her pain is reasonably controlled by medication, and the medication does not cause her significant side effects.

However, the court does not find significant evidence in the record to support the ALJ's assessment of Bowers's *mental* functional capacity throughout the period in question. The evidence indicates Bowers operated at a significantly low level of functioning from at least two years prior to her alleged onset date until at least April 2004. The record then contains a significant gap in Bowers's mental health history. Bowers saw Dr. Jackson on April 30, 2004, and she was still markedly impaired in her functioning at that time. (*See* R. 376) It appears Bowers continued to see a psychiatrist until at least June 28, 2004, and her psychiatric medications also were adjusted at times by her family doctor or a physician's assistant in the doctor's office. (*See* R. 212-13, 221-24, 227)

The next record evidence regarding Bowers's mental health treatment occurs some fifteen months later, on July 15, 2005, when Dr. Lassise performed a psychiatric evaluation of Bowers. At that time, the doctor indicated Bowers was "doing fairly well" on her medications. (R. 373) However, his diagnoses continued to include Major

Depression, Recurrent; Mixed Personality Disorder; and Recurrent Mood Difficulties. He referred Bowers to a therapist for individual counseling, and at Bowers's first session, on August 19, 2005, she reported symptoms of depression, anxiety, and agoraphobia. (R. 375) Thus, although it appears Bowers's mental health condition may not have improved significantly between June 2004 and July 2005, that conclusion is less than clear from the record evidence.

Considering the record as a whole, the undersigned finds substantial evidence supports a conclusion that Bowers was disabled due to her mental impairments from her alleged onset date until at least June 28, 2004. In addition to the records of Bowers's mental health treatment, the court also credits Bowers's testimony regarding her inability to cope with the demands and stresses of full-time employment. The regulations recognize that when a claimant alleges disability on the basis of a mental health condition, "the circumstances surrounding termination of [the claimant's] work effort are particularly useful in determining [the claimant's] ability to function in a work setting." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(D)(3). Bowers's testimony and her earnings records evidence her inability to maintain employment for any sustained period of time.

The undersigned further finds the record lacks sufficient evidence to make a determination regarding whether Bowers remained disabled due to her mental impairments after June 2004. As a result, remand is necessary for further development of the record on this issue.

## V.  CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[7] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be reversed and this case be remanded pursuant to sentence four of 42 U.S.C. § 405(g), for a finding that Bowers was disabled from September 1, 2002, through June 28, 2004; and for further proceedings and development of the record to determine whether Bowers's disability has continued since June 28, 2004.

**IT IS SO ORDERED.**

**DATED** this 6th day of December, 2007.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[7]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72.